**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **TAMMY WELLS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION NO. 5:12-CV-18 (MTT)** |
| | ) |
| **GENERAL DYNAMICS** | ) |
| **INFORMATION TECHNOLOGY,** | ) |
| **INC.,** *et al.,* | ) |
| | ) |
| **Defendants.** | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

**ORDER**

Before the Court is the Defendants' Motion for Summary Judgment (Doc. 152) and the Plaintiff's Motion for Leave to File a Response to the Defendants' Motion for Summary Judgment (Doc. 168).  The Plaintiff's Motion is **GRANTED**, and the Court has considered her Response in its consideration of the Defendants' Motion for Summary Judgment.  For the following reasons, the Defendants' Motion is **GRANTED**.

## I.     PROCEDURAL HISTORY

The Plaintiff filed her complaint on May 11, 2010, in the United States District Court for the Northern District of Georgia.  (Doc. 1).  After ruling on several motions, including two motions to dismiss, the Northern District of Georgia transferred the case to this Court on January 12, 2012.  (Doc. 115).  The parties do not dispute the Northern District's characterization of the Plaintiff's remaining claims at the time of transfer: (1) racially hostile work environment claims brought pursuant to Title VII and § 1981 against Defendant General Dynamics Technology, Inc. (GDIT); (2) retaliation claims brought

pursuant to § 1981 against GDIT and Defendant Michael Ragland; and (3) a state law "identity theft" claim against Defendants Gwendolyn Krind, Tabitha Waldrop, and Elizabeth Lines.  (Doc. 115 at 1-2).

After transfer, the Defendants again moved to dismiss, contending the Plaintiff, by then representing herself, had failed to discharge her discovery obligations and had improperly denied them access to her medical records.  (Doc. 118).  The Court denied the motion, but ordered the Plaintiff to sign medical authorizations and to complete her deposition.  (Doc. 135).

## II.    FACTUAL HISTORY

On August 18, 2008, the Plaintiff, an African-American female, began working as a senior technical trainer for GDIT in Warner Robins, Georgia.  (Doc. 153 at 6, ¶ 25; Doc. 169-2 at 6, ¶ 25).  Her tenure at GDIT was short, but apparently was packed with drama.  At first, the Plaintiff expressed happiness with her employment at GDIT.  For example, on August 19, the Plaintiff wrote new co-worker Tabitha Waldrop, "Tabitha, Thank you for the warm welcome… I have only been here a couple of days.  So far, everyone is taking good care of me…."  (Doc. 152-10 at 6).  Also, the Plaintiff and co-worker Beth Lines planned to attend church together, and Lines began helping the Plaintiff's husband find work in the Warner Robins area.  (Doc. 152-3 at 3; Doc. 152-7 at 33, 34-35).

Then, on October 12, 2008, the Plaintiff filed a complaint with the Warner Robins Police Department claiming that someone had stolen her identity by using her personal information to open credit card accounts.  (Doc. 153 at 14, ¶ 71; Doc. 169-2 at 16, ¶ 71).  The Plaintiff initially identified Waldrop and Lines, both of whom are white, as suspects

in the identity fraud.  (Doc. 153 at 14, ¶ 72; Doc. 169-2 at 16, ¶ 72).  The Plaintiff later accused Gwendolyn Krind, another GDIT employee who is African-American.  (Doc. 153 at 16, ¶ 83; Doc. 169-2 at 18, ¶ 83).  Warner Robins Police Detective Meredith Edwards investigated the Plaintiff's identity theft report, and Edwards concluded that "there was no evidence to support [the Plaintiff's] allegations that her co-workers were involved in the alleged identity theft."  (Doc. 118-5 at 2, ¶ 4).  Further, Edwards found "no reason to believe that anyone at [the Plaintiff's] work place was involved in the identity theft."  (Doc. 118-5 at 2, ¶ 4).  Edwards said she questioned the Plaintiff's mental wellness because the Plaintiff "seemed to zero in on various co-workers, and when one co-worker was likely to be eliminated as a suspect, she would blame another co-worker.  Each time she accused someone new, [the Plaintiff] was equally adamant that the newly-accused person was the perpetrator, and she was persistent, contacting me frequently."  (Doc. 118-5 at 3, ¶ 5).[1]

On October 29, 2008, the Plaintiff reported the alleged identity theft to GDIT's "ethics hotline."  (Doc. 153 at 18, ¶ 91; Doc. 169-2 at 20, ¶ 92).  On November 7, Waldrop submitted her own internal complaint alleging that the Plaintiff harassed and defamed her.  (Doc. 153 at 20, ¶ 103; Doc. 169-2 at 23, ¶ 103).   Around the same time, Lines reported that the Plaintiff had yelled at her and called her evil during a work meeting.  (Doc. 153 at 20, ¶ 105; Doc. 169-2 at 23, ¶ 105).

On December 2 and 3, 2008, Estella Holliday, then GDIT's Director of Human Resources,[2] and Human Resources Manager Cindy Pineda, traveled to Warner Robins

---

[1] All parties rely to some extent on Detective Edwards's affidavit testimony or file materials.  No party has objected to this evidence.

[2] Holliday is now the Staff Vice President of Human Resources.   (Doc. 152-12 at 1).

from Virginia to discuss the complaints.  (Doc. 153 at 21, ¶ 108; Doc. 169-2 at 24, ¶

108; Doc. 152-12 at 2; Doc. 152-1 at 3).  According to Holliday, the Plaintiff did not then

complain that she was being treated differently or harassed because of her race.

Rather, the Plaintiff told Holliday she was being treated differently because she had

accused her co-workers of stealing her identity.  (Doc. 152-12 at 2-3, ¶ 9).  At the

Plaintiff's request, Pineda and Holliday arranged for the Plaintiff to work from home, and

the Plaintiff worked from home for the remainder of her active employment.  (Doc. 153

at 22, ¶¶ 111-12; Doc. 169-2 at 25, ¶¶ 111-12).

On December 9, the Plaintiff submitted a written complaint alleging she had been

mistreated by her supervisor, Mike Ragland.  (Doc. 153 at 22, ¶ 113; Doc. 169-2 at 25,

¶ 113).  This complaint raised a list of slights that have no apparent relationship to race:

other employees were "in the halls making really loud noises," and Ragland did nothing

about it; the Plaintiff was chastised for being one minute late to a staff meeting when in

fact the clock in the conference room was two and a half minutes fast; Ragland did not

invite her to a meeting; she was excluded from the Thanksgiving lunch; co-workers'

projects got more attention than hers; she was not allowed to close her office door; and

Ragland did not personally give her the "Presenter's coin" as he did for other employees

("what am I, the Bubonic plague?").  (Doc. 152-7 at 21-23).  Only one specific complaint

mentioned race:

> When one of my co-worker's [sic], who is a police suspect in the theft of
> my identity, told my manager about being questioned by the authorities,
> he accused me of committing identity theft against myself.  He appears
> incapable of thinking that one of his white employees could have
> committed this crime.  Rather than reserve judgment until the police
> investigation has been completed, he makes accusations against me.  In
> his eyes, the victim of this crime is the criminal.  Based on how I am being

treated, the only conclusion I can draw is that his feelings on the matter are based on race.

(Doc. 152-7 at 22).  She concluded her complaint with a general allegation based on race:

> Mike [Ragland] has been color struck from the first day I showed up for work, and he still has not gotten over it.  My work environment has become increasingly more hostile.  I believe that this hostility is based on race.  The law and General Dynamics' policies prevent my management from treating me differently due to the color of my skin.  His actions are clearly discriminatory and must stop.

(Doc. 152-7 at 22-23).  In her deposition, the Plaintiff explained that her assertion that Ragland had been "color struck" from the Plaintiff's first day of employment is based on what happened when they first met:  "On my first day at work, I extended my hand to Mike Ragland and he appeared to be color struck."  (Doc. 173-1 at 137-38).  Ragland, the Plaintiff later testified, backed away from her.  When asked if Ragland shook her hand, the Plaintiff testified that he may have "touched it."  (Doc. 173-1 at 138).

The Plaintiff's December 9 internal complaint, along with the complaints from the Plaintiff's co-workers, prompted further inquiry from Pineda and Holliday about specifics of claims of racial misconduct.  In response, the Plaintiff mentioned two specific incidents directly involving race.   After her first day of work, the Plaintiff and several co-workers went to Starbucks.  Lines's daughter joined them and the daughter tried to "imitate black girls."  (Doc. 173-1 at 135-36).  Then in September 2008, while eating together at a Zaxby's restaurant, Waldrop told the Plaintiff that she "was fortunate to be in Warner Robins and not in Augusta, where [Waldrop] had moved from, because they wouldn't hesitate to use the N word and they tell blacks to their face that they don't like them."  (Doc. 173-1 at 121:7-11).

Holliday and Pineda proposed that the Plaintiff relocate to GDIT's Alexandria, Virginia office, where she would be closer to her husband.  (Doc. 153 at 24, ¶ 125; Doc. 169-2 at 28, ¶ 125; Doc. 152-12 at 3, ¶ 11).  The Plaintiff initially agreed, and her relocation to Virginia was scheduled for March 31, 2009.  (Doc. 153 at 25, ¶ 127; Doc. 169-2 at 28, ¶ 127).

On March 2 or 3, 2009, the Plaintiff reported that she injured her back while moving a printer at home.  (Doc. 153 at 25, ¶ 129, Doc. 169-2 at 28, ¶ 129).  The Plaintiff claimed that moving the printer was a task related to her relocation to Virginia and filed a workers' compensation claim.  (Doc. 153 at 25, ¶ 131, Doc. 169-2 at 29, ¶ 131).  GDIT timely controverted the claim, and an administrative law judge eventually found in GDIT's favor, concluding that the Plaintiff's account of her injury was "not credible."  (Doc. 153 at 26, ¶¶ 133-34, Doc. 169-2 at 29, ¶¶ 133-34).  The ALJ's decision was affirmed by the State Board of Workers' Compensation and then by Houston County Superior Court.  (Doc. 153 at 26, ¶¶ 135-36, Doc. 169-2 at 30, ¶¶ 135-36).

On March 24, the Plaintiff began a leave of absence from GDIT and applied for short-term disability benefits.  (Doc. 153-2 at 27, ¶ 141-42; Doc. 169-2 at 31, ¶ 141-42; Doc. 152-8 at 3).  The Defendants allege, with supporting documentation, that GDIT's disability claims administrator, Sedgwick, initially denied the Plaintiff's claim because the Plaintiff failed to provide necessary medical records.  (Doc. 152 at 27, ¶ 143; Doc. 152-8 at 3).

On May 11, Charles Valentini, GDIT's Senior Human Resources Manager, informed the Plaintiff that because she was not yet eligible for Family and Medical

Leave Act leave,[3] she could either return to work or take a 30-day personal unpaid leave of absence.  (Doc. 153 at 27, ¶ 144; Doc. 152-8 at 3).  On May 14, Valentini wrote the Plaintiff that it was clear she was not intending to return to work and that she would be placed on a 30-day leave effective May 15, 2009.  (Doc. 152-8 at 4).

On July 23, Valentini again wrote the Plaintiff, this time to inform that her personal leave of absence, which had been extended to July 23, would not be extended any further because she had been absent from work for more than three months and had "not been approved for short-term disability leave."  (Doc. 152-8 at 5).  Valentini also informed the Plaintiff that if she did not return to work, she would be "removed from payroll."  (Doc. 152-8 at 5; Doc. 152 at 28, ¶ 145; Doc. 169-2 at 32, ¶ 145).  Absent word from the Plaintiff by July 27, the letter continued, GDIT would assume that the Plaintiff did not intend to return to work, and GDIT would start processing the Plaintiff's "separation."  (Doc. 152-8 at 5).  Because the Plaintiff never stated any "present intent to return," Valentini wrote the Plaintiff on August 3, 2009, to inform her that her employment was terminated, "effective today."  (Doc. 152-8 at 7; Doc. 153 at 28, ¶ 147; Doc. 169-2 at 32, ¶ 147).

However, on September 1, 2009, after the Plaintiff submitted additional medical records, Sedgwick approved, with retroactive effect, the Plaintiff's application for short-term disability benefits.  (Doc. 153 at 28, ¶ 148; Doc. 169-2 at 32, ¶148; Doc. 152-12 at 4, ¶ 14).  GDIT then immediately reinstated the Plaintiff and amended her records to "reflect no break in service."  (Doc. 153 at 28, ¶ 147; Doc. 169-2 at 32, ¶ 147; Doc. 152-12 at 4-6).  On September 22, the Plaintiff was approved for long-term disability

---

[3] An employee must be employed for twelve months before becoming eligible for leave under the FMLA.

benefits and she received those benefits ($3,499.00 per month) through May 31, 2011. (Doc. 153 at 28, ¶ 149; Doc. 169-2 at 32, ¶ 140; Doc. 152-12 at 5).

On May 7, 2009, the Plaintiff filed her complaint with the EEOC.  That complaint cites two incidents involving race.  She alleged Lines told her she "sounded white on the phone," and she claimed Keith Pressey[4] told her that Ragland thought he was hiring a white person.  (Doc. 152-5 at 44).

After filing this suit on May 11, 2010, the Plaintiff alleged other incidents, not explicitly involving race, in support of her race-based hostile work environment claim. For example, the Plaintiff complains that her office furniture was old and ripped her clothes, and that she was not processed for TS/SCI, a security clearance allowing access to various classified documents.  (Doc. 169-2 at 46).  Though the Plaintiff admits that "[i]n the short time I was [at GDIT], I worked on the LMS, and I don't believe you needed TS/SCI access for that," she still claims that GDIT's failure to submit her for TS/SCI within "seven months into her employment" constitutes unlawful conduct.   For comparison, the Plaintiff contends that another new employee, who was hired approximately four months before her, received her TS/SCI within eight months.  (Doc. 169-2 at 47-48).  Given these basic facts, it perhaps is unnecessary to discuss the Plaintiff's security clearance allegations in detail.  But the Plaintiff believes the issue has considerable significance so further details are provided.

---

[4] Former GDIT employee Pressey has played a prominent role in this matter.  Although the parties have much to say about Pressey, the Court does not.  However, the Court notes that Pressey adds yet another layer of drama.  According to the Defendants, "open and notorious" behavior led many to believe Pressey, second in command at the Warner Robins office, and the Plaintiff were having an affair.  (Doc. 152-1 at 7).  The Court sees no reason to dwell on Pressey's issues except to say that Pressey was, and has remained, the Plaintiff's active ally.

On September 5, 2008, the Plaintiff was "put into the JPAS database." (Doc. 169-9 at 26). Because the Plaintiff did not have TS/SCI when she arrived at the Warner Robins office, Krind asked Ragland whether she should begin the process of obtaining the Plaintiff's security clearance. (Doc. 169-9 at 26). "[H]e stated not at this time, which is normal[] for any new individual." (Doc. 169-9 at 26). On December 17, 2008, the Plaintiff asked Krind to send her a link that would allow her to apply for a security clearance. Krind responded "this was not the way [obtaining TS/SCI clearance] was done; proper channels had to be followed." (Doc. 169-9 at 26). Krind also informed her "that everyone's clearance works different depending on that individual." (Doc. 169-9 at 26). On March 17, 2009 (after the Plaintiff's alleged injury), the Plaintiff asked Krind and Ragland why she had not yet received a link for her TS/SCI application. (Doc. 169-9 at 27). Krind stated she did not answer the email because she had already explained to the Plaintiff the procedure for obtaining security clearance. A few days later, the Plaintiff again questioned Krind about her security clearance. Krind directed the Plaintiff to Ragland. After Ragland spoke with the Plaintiff, he told Krind to proceed with the Plaintiff's application. (Doc. 169-9 at 27). Krind obtained the appropriate paperwork for the Plaintiff to complete and informed Ragland that the Plaintiff had to sign two forms in Krind's presence to initiate the application process. (Doc. 169-9 at 28). Ragland responded that the Plaintiff "has been on sick leave the past two days so I will let you know Friday morning if she will be coming to the office then." (Doc. 169-9 at 27). However, the Plaintiff never returned to active employment with GDIT.

## III.    SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing…relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Conclusory assertions, unsupported by specific facts presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment." *Anderson v. Hunte Delivery System, Inc.*, 2012 WL 1392664, *2 (M.D. Ala) (quoting *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 888 (1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997) (conclusory assertions in the absence of supporting evidence are insufficient to withstand summary judgment). "Speculation does not create a genuine issue of material fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal citation omitted) (emphasis omitted). The party

opposing summary judgment must respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence supports his or her claim, and may not rest upon the mere allegations or denials of the pleadings.  Fed. R. Civ. P. 56(e); *Johnson v. Board of Regents of University of Georgia*, 263 F.3d 1234, 1264 (11th Cir.2001).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Thus, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citations omitted).  A plaintiff must present evidence demonstrating that he can establish the basic elements of his claim. *Celotex*, 477 U.S. at 322.  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## IV.    DISCUSSION

### A. Claims against General Dynamics Information Technology and Mike Ragland

The Plaintiff has two claims remaining against Defendant GDIT: (1) a race-based hostile work environment claim pursuant to § 1981 and Title VII; and (2) a retaliation claim pursuant to § 1981.  The Plaintiff has one remaining claim against Mike Ragland: a retaliation claim pursuant to § 1981.  The factual bases for these claims almost completely overlap.

### 1. Framework for Hostile Work Environment Claims Pursuant to § 1981 and Title VII

Hostile work environment claims pursuant to § 1981 and Title VII are analyzed under the same analytical framework. *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009). To establish a prima facie case for a hostile work environment claim, a plaintiff must prove that (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her race or gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) there is a basis for holding the employer liable. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). "[T]o be actionable the harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Bryant,* 575 F.3d at 1297 (internal quotations and citations omitted).

When evaluating whether the harassment is sufficiently severe or pervasive, the Court looks at the totality of the circumstances and considers "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Freeman v. City of Riverdale*, 330 Fed. App'x 863, 865 (11th Cir. 2009).[5] Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult. *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1276-77 (11th Cir. 2002); *see also Smithers*

---

[5] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

*v. Wynne,* 319 Fed. App'x 755 (11th Cir.2008) (citing *Miller* and stating same).  It is not sufficient to merely highlight a couple of utterances, even a couple of racial slurs, as evidence of a hostile work environment.  The Supreme Court has noted that "teasing, offhand comments, and isolated incidents" do not constitute discriminatory changes in terms and conditions of employment.  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal citation omitted).

In other words, the "standards for judging hostility are sufficiently demanding to ensure that [discrimination laws do] not become a general civility code." *Byrne v. Alabama Alcoholic Beverage Control Bd.*, 635 F. Supp. 2d 1281, 1296 (M.D. Ala. 2009) (quoting *Faragher*, 524 U.S. at 788).  *Compare Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) (seven incidents of racist acts, including several co-workers wearing clothes bearing the Confederate flag on the same days and leaving bananas in the plaintiff's truck, could be considered "as threatening confrontation" and, thus, was severe and pervasive behavior); *Miller*, 277 F.3d 1269 (behavior was severe and pervasive when ethnic slurs were directed towards the plaintiff three to four times a day while the plaintiff was trying to perform his work duties); *with Hall v. Dekalb County Government*, 2013 WL 104810 (11th Cir.) (unpublished) (behavior was "improper," but did not rise to the level of severity or pervasiveness necessary to sustain a hostile work environment claim when a co-worker referred to the plaintiff as "boy" and, when the plaintiff reported this comment, his supervisor laughed); *Smithers*, 319 Fed. App'x 755 (behavior was not severe and pervasive when plaintiff's supervisor allegedly made negative comments about the plaintiff and the plaintiff thought others in the office were gossiping about him); *Satchel v. School Bd. of Hillsborough County*, 251 Fed. App'x 626

(11th Cir. 2007) (it was not objectively reasonable for the plaintiff to perceive "workplace disputes" as severe enough to constitute a hostile work environment claim). *See also Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (behavior was not severe and pervasive to sustain a hostile work environment claim based on sexual harassment when the plaintiff's supervisor rubbed his hip against the plaintiff's hip while touching her arm and smiling, stared at the plaintiff's groin area three times, and constantly followed and stared at the plaintiff).[6]

### 2. Framework for a Retaliation Claim Pursuant to § 1881

Because the parties have assumed that Title VII retaliation framework applies to this § 1981 claim, the Court will also. *See e.g. Tucker v. Talladega City* Schools, 171 Fed. App'x 289 (11th Cir. 2006) (reasoning the same). *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318 (11th Cir. 1998) (explaining that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework").[7] The Plaintiff relies on the *McDonnell Douglas* framework for analyzing circumstantial evidence to establish a prima facie case of retaliation. To establish a prima face case of retaliation, the Plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006).

---

[6] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *AMTRAK v. Morgan*, 536 U.S. 101, 116 n. 10 (2002)

[7] However, some Eleventh Circuit case law has noted that Title VII's prohibition against retaliation for opposition to conduct reasonable believed to be violative of Title VII is not identical to the kind of discrimination proscribed by § 1981. "It is well established that § 1981 is concerned with racial discrimination in the making and enforcement of contracts." *Little v. United Technologies, Carrier Transicold, Div.*, 103 F.3d 956, 961 (11th Cir. 1997).

The adverse action must be one a reasonable employee would have found to be materially adverse. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Additionally, the Supreme Court requires causal links based on mere temporal proximity to be "very close" and approvingly cited circuit court decisions holding three- and four-month periods insufficient to establish a causal connection.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001).[8]

If the Plaintiff establishes a prima facie case of retaliation, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons," but must produce evidence to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added).

The Plaintiff then has the opportunity to show that the employer's stated reason is in fact pretext for discrimination.  "The [P]laintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Kragor*, 702 F.3d at 1308 (quoting *Burdine*, 450 U.S. at 256).  Put another way, "[a] plaintiff may … survive summary judgment by 'presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the

---

[8] The Eleventh Circuit has recognized that a seven-week temporal proximity between acts could establish a causal connection.  *Nicholas v. Bd. of Trustees of Univ. of Ala.*, 251 Fed. App'x 637, 644 (11th Cir. 2007).  However, the Eleventh Circuit recently held that a two-month period is not "very close."  *Williams v. Waste Mgmt., Inc.*, 2011 WL 207932, at *3 (11th Cir. 2011).

employer's legitimate, non-discriminatory reasons.'" *Freeman v. Perdue Farms Inc.*, 496 Fed. App'x 920, 925 (11th Cir. 2012) (quoting *Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 965 (11th Cir.1997)).[9]

### 3. The Plaintiff's Factual Allegations Supporting Her Hostile Work Environment and Retaliation Claims

The Plaintiff alleges that the following facts, in the order listed, support both her racially hostile work environment claim against GDIT and her retaliation claims against GDIT and Ragland: (1) Ragland failed to submit the Plaintiff for TS/SCI clearance within seven months of her employment; (2) Ragland's instruction to the Plaintiff to keep her office door open; (3) Ragland embarrassed the Plaintiff after she emailed him complaining about noise in the hallway by "chastising" her and printing the email for others in the office to sign; (4) after the Plaintiff was late to a staff meeting, Ragland, after the meeting, "closed the door and chastised the Plaintiff;" (5) Ragland minimized his communication with the Plaintiff; (6) Ragland "chastised" Keith Pressey for assisting the Plaintiff with heavy lifting; (7) the Plaintiff found an ant mound on her desk after lunch on day; (8) Lines mistreated the Plaintiff and Ragland did not do anything to stop this mistreatment; (9) the Plaintiff was given a "used" headset and had to pay for a thumb drive and desk calendar herself; (10) the Plaintiff's desk ripped her clothing, and

---

[9] The Court recognizes that establishing the *McDonnell Douglas* elements is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory intent. A plaintiff does this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. Of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). Thus, a plaintiff could make out a prima facie case for discrimination even without providing comparator employees. However, the Plaintiff in this case has not presented "a convincing mosaic of circumstantial evidence" that GDIT or Ragland acted with discriminatory intent. Therefore, she does not meet *Lockheed-Martin's* standard.

the Plaintiff had to put packing tape on the splintered portions of the desk to avoid further clothing damage; (11) Ragland did not use the Plaintiff's voice on project videos; (12) Ragland backed away from the Plaintiff instead of offering his right hand on her first day of work; (13) Waldrop's comment about racism in Augusta; (14) Lines comment that the Plaintiff did not sound black; (15) Lines's daughter's imitation of a black girl at Starbucks; (16) the Plaintiff's timesheets were signed late; and (17) there was a urine-like substance on roses that the Plaintiff had in her office.  (Doc. 169-2 at ¶¶ 68, 85, 90-94, 97-99, 106, 115, 122, 124, 133-34, 181, 183, 187, 188, 205, 211-13, 219; Doc. 173-1 at 121-123, 142).

In her response brief, the Plaintiff asserts six incidents that  "amount[] to direct adverse employment actions, which are temporally connected to [her] discrimination complaint:" (1) GDIT told the Plaintiff that she had to relocate or be terminated; (2) GDIT cancelled her medical insurance; (3) Ragland replaced the Plaintiff's voice on a video she developed; (4) Ragland chastised the Plaintiff by email regarding the video; (5) Sarah Makin, the training manager, praised all participants, but did not praise the Plaintiff; and (6) Ragland restricted the Plaintiff's access to the management systems software accounts ("SABA and Centra") making it difficult for her to be productive. (Doc. 169-1 at 12).  The Plaintiff admits that she never "received an official termination date from GDIT." (Doc. 169-1 at 12).  However, later in her response, the Plaintiff alleges that "the Defendants' denial of [the] Plaintiff's worker's compensation and short term disability claims firing and subsequent rehiring and finally terminating [the] Plaintiff's employment and cutting the Plaintiff off from pertinent resources to do her job" are also "examples" of adverse employment actions.  (Doc. 169-1 at 22).

### 4.  The Plaintiff's Hostile Work Environment Claim against GDIT

GDIT argues that the Plaintiff does not allege the kind of "severe and pervasive" harassment required to sustain a hostile work environment claim.  (Doc. 152-1 at 2).  The Court agrees.

Even assuming the conduct and statements alleged by the Plaintiff are rude, disrespectful or unprofessional, they do not create an environment "permeated with discriminatory intimidation, ridicule, and insult" as required to establish a prima facie case under Title VII and § 1981 for hostile work environment.  "Title VII is not a general civility code for the workplace, and its protections do not extend to everything that makes an employee unhappy."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001) (internal quotation marks and citation omitted).  Taking the Plaintiff's allegations as true, the conduct by the GDIT employees was not frequent nor was it severe.  Further, there is no evidence that the conduct unreasonably interfered with the Plaintiff's job performance.  *See Freeman*, 330 Fed App'x at 865 (listing factors to consider when determining whether conduct amounts to "severe and pervasive" conduct).

Most importantly, the alleged misconduct lacks the necessary race-related connotations to be actionable as race-based discrimination.  Only three of the Plaintiff's allegations contain references to race: (1) Waldrop's comment, made at a restaurant, regarding racism in Augusta; (2) Lines's daughter imitating a black girl at Starbucks; and (3) Lines's alleged comment to the Plaintiff that she did not sound black over the telephone.  Putting aside the fact that two of the incidents happened outside the workplace, the Plaintiff must do more than highlight a few incidents to establish a prima facie hostile work environment claim based on race.  No incident involved racial slurs,

there is no evidence that anyone involved intended to offend the Plaintiff, and there is no evidence that the Plaintiff, at the time, took offense.

Accordingly, the Court has considered the effect of these acts on the working environment, "in context, not as isolated acts," *Mendoza*, 195 F.3d at 1246, and finds that, in their totality, the alleged incidents do not satisfy the Eleventh Circuit's "baseline" for severity or pervasiveness that is required to survive summary judgment. *Id.* at 1244. Thus, summary judgment in favor of GDIT is appropriate on the Plaintiff's Title VII and § 1981 hostile work environment claim.

### 5.  The Plaintiff's Retaliation Claim Pursuant to § 1981 against GDIT

The Plaintiff contends that she "suffered adverse employment actions in retaliation to exercising a protected right, filing an EEOC complaint." (Doc. 169-1 at 2). The Plaintiff's EEOC complaint was filed on May 7, 2009. (Doc. 173-1 at 176). The Plaintiff does not directly allege that her December 9, 2008, internal complaint constitutes protected expression, but the parties, when addressing the retaliation claim, mention allegations from the December 9 internal complaint. The Court will assume, for purposes of this discussion only, that the Plaintiff's retaliation claim is based on both complaints.

GDIT denies that the Plaintiff has established any prong of her prima facie case. The Plaintiff did not engage in protected activity because even if she believed that GDIT had engaged in an unlawful employment practice, that belief was not objectively reasonable; the alleged acts of retaliation do not rise to the level of adverse actions; and that the alleged adverse actions were not connected to the Plaintiff's allegedly protected activity. (Doc. 152-1 at 2).

### a. Whether the Plaintiff's Complaints Constitute Protected Activity

To show that her internal and EEOC complaints constitute statutorily protected activity the Plaintiff "must prove both (1) a subjective, good-faith belief that [GDIT] engaged in an unlawful employment practice and (2) that her belief was objectively reasonable." *Tatt v. Atlanta Gas Light Co.*, 138 Fed. App'x 145, 147 (11th Cir. 2005)(citing *Little v. United States Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)). The Plaintiff's belief must be "objectively reasonable in light of the facts and record presented." *Saffold,* 147 Fed. App'x at 951. "Put differently, an employee's statements constitute 'protected activity' only if they reflect an objectively reasonable, subjective belief that the employer engaged in an unlawful employment practice." *Duncan v. Madison County*, 2007 WL 2874803, *7 (M.D. Ga.).

Here, the Plaintiff's complaints do not constitute protected activity because any belief that she was being subjected to racially discriminatory conduct, based on the evidence before the Court, was not objectively reasonable. "It is objectively unreasonable to believe that the use of racially discriminating language on one occasion by one co-worker away from the workplace is enough to permeate the workplace with discriminatory intimidation, ridicule, and insult and to alter the conditions of the of the [Plaintiff's] employment and create an abusive work environment." *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1214 (11th Cir. 2008). "[A] racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice … and opposition to such remark, consequently, is not statutorily protected conduct." *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997). The Eleventh Circuit in *Butler* further noted that, "not every act by

an employee in opposition to racial discrimination is protected.  The opposition must be directed at *an unlawful employment practice of an employer*, not an act of discrimination by a private individual."  *Id.* (internal quotations and citations omitted) (emphasis added).

As noted, most of the Plaintiff's complaints have no relation to race.  Rather, they stem from personality conflicts with her co-workers, the Plaintiff's accusations that three of her co-workers,[10] one of whom is black, stole her identity, and her supervisor's and co-workers' non-race based slights.  It was not objectively reasonable for the Plaintiff to believe that her co-workers' alleged behavior, completely unrelated to race, constituted an unlawful employment practice

Further, the factual allegations that reference race are not sufficient to establish an objectively reasonable belief that GDIT engaged in an unlawful employment practice. Lines's comment that the Plaintiff did not sound black was made after the Plaintiff, in a telephone conversation before the Plaintiff reported to work, told Lines that she was black.  Nothing in the Plaintiff's account of Lines's comments suggests any discriminatory conduct on the part of Lines, much less any conduct for which GDIT could be responsible.  Indeed, the Plaintiff's close friend, Keith Pressey, also told the Plaintiff, around the same time, that she did not sound black.  (Doc. 173-1 at 126).  With regard to Waldrop's comment about racism in Augusta, the Plaintiff does not explain how this comment, made away from the workplace, justifies a belief that GDIT engaged in an unlawful employment practice, much less that any such belief was objectively

---

[10] The Plaintiff "disputes" that Gwendolyn Krind, GDIT's Program Security Officer, is her co-worker.  This is specious.  Krind is a GDIT employee whose duties required "her to visit the [Warner Robins] GDIT Park Drive office about once a week."  (Doc. 152-11).

reasonable.  There is no evidence that the Plaintiff took any offense when the comment was made and she only mentioned it in December 2008 to Pineda and Holliday. Similarly, the Starbucks incident involving Lines's young daughter certainly cannot justify an objectively reasonable conclusion that GDIT had engaged in an unlawful employment practice.  Again, even the Plaintiff's account of that incident demonstrates that she took no offense.  (Doc. 173-1 at 131) ("I said to her, 'Wow you do that a lot better than me.'").  Finally, the Plaintiff's perception that Ragland was "color struck," leading him to back away before "touching" her hand is just that, her perception. Nothing in the Plaintiff's account of that incident suggests that Ragland had engaged in an unlawful employment practice.

In sum, the Plaintiff has not established the first prong of her prima facie retaliation case because any belief that GDIT engaged in unlawful employment practices, her belief was not objectively reasonable.

### b.  Whether the Plaintiff Suffered Any Adverse Actions

Even if the Plaintiff were able to satisfy the first prong of her prima facie case, she has failed to establish that she suffered an adverse action.  To constitute an adverse action, the action "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII."  *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001) (internal quotation marks and citation omitted).

First, the Plaintiff's allegations regarding various slights by co-employees are not adverse actions.  The Plaintiff contends (1) that Ragland replaced her voice on a video, (2) that Ragland chastised her in an email, (3) that Ragland cut off her access to various programs making her less productive, and (4) that Sarah Makin praised all participants for their work on the video except for the Plaintiff.  "[T]he courts have held that shunning or ostracism by co-workers and supervisors is insufficient to sustain a retaliation claim." *Bozeman v. Per-Se Technologies, Inc.*, 456 F. Supp. 2d 1282, 1345 (N.D. Ga. 2006) (citing *Wu v. Thomas*, 996 F.2d 271, 273 n. 3 (11th Cir. 1993) and others for same). Accordingly, these allegations do not amount to actionable adverse actions.

Second, GDIT's decision to controvert the Plaintiff's workers' compensation claim and GDIT's denial of her short-term disability benefits are not adverse actions.  An employer's admitted "refusal to allow [the plaintiff's] allegedly valid workers' compensation claim to settle or to let [her] receive medical benefits to which [she] allegedly was lawfully entitled in retaliation for the discrimination lawsuit he filed against it potentially alters privileges of employment and ... could constitute an adverse employment action," *Riccard v. Prudential Insurance Co.*, 307 F.3d 1277, 1292-93 (11th Cir. 2002).  But the Plaintiff does not allege that GDIT in bad faith refused to settle her workers' compensation claim.  Controverting a workers' compensation claim, alone, without evidence or allegations of bad faith on the part of the employer does not in itself constitute an actionable adverse action and cannot serve as a basis of a retaliation claim.

Moreover, the undisputed facts reveal no evidence that would warrant an allegation that GDIT acted in bad faith when it denied that the Plaintiff's alleged injury

while moving a printer at her home constituted a compensable injury.  In fact, the

Workers' Compensation ALJ found that the Plaintiff's account of her injury was "not

consistent with her work duties.[11]   (Doc. 152-5 at 49).  The ALJ also found that the

Plaintiff "had a pre-existing neck problem" and that the "symptoms she was reporting

were on the wrong side of the herniation identified in the MRI." (Doc. 152-5 at 50).[12]

Even without the benefit of the ALJ's unobjected to findings, it is clear that GDIT could

reasonably controvert the Plaintiff's claim that her injury at home was work related.  In

short, there is no evidence that GDIT's denial of the Plaintiff's workers' compensation

claim was based on improper motives.[13]

Similarly, the Plaintiff has not explained how Sedgwick's initial denial of the

Plaintiff's short-term disability benefits claim is an adverse action.  She points to no facts

suggesting that GDIT played a role in this decision.  Moreover, the delay in the approval

of her benefits was due to the Plaintiff's failure to provide the appropriate medical

records.   When she did provide the appropriate medical records, her claim was

approved.

In a declaration filed with her response to the Defendants' motion for summary

judgment, the Plaintiff contends that the May 15, 2009, cancellation of her medical

---

[11] The ALJ's determination was upheld by the State Board of Worker's Compensation on March 22, 2010 (Doc. 152-5 at 51), and then by the Houston County Superior Court on August 19, 2010 (Doc. 152-5 at 53-55).

[12] The Plaintiff has not objected to the admission of these findings.

[13] All this underscores a point that seems to have been lost on all parties but particularly on the Plaintiff. Although the Plaintiff complains mightily about GDIT's denial of her workers' compensation and the handling of her disability claims, the Plaintiff received a monthly disability benefit in the amount of $3,499.99 through May 2011.  It is difficult to understand the basis for some of the Plaintiff's complaints when the reality is that the Plaintiff, beginning in March 2009, claimed to be disabled and GDIT's claims administrator in fairly short order accepted that claim and paid her substantial benefits.

insurance was an adverse action.  (Doc. 169-2 at 75).  The Defendants contend that the

Court should not consider this allegation because the Plaintiff failed to identify this

adverse action in both her interrogatory responses and her deposition.  (Doc. 172 at 9).

The Defendants argue "'[w]hile it is true that courts must construe the filings of pro se

plaintiffs liberally, this standard … does not afford plaintiffs with an opportunity to raise

new claims at the summary judgment stage.'"  (Doc. 172 at 9) (quoting *Gilmour v.*

*Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004)).

The Defendants' point is well-taken and the Plaintiff's assertion that that the

alleged cancellation of her medical insurance was an adverse action can be, and is,

rejected for this reason alone.  In addition, the Plaintiff fails to point to specific facts,

evidence, or documentation to support her assertion that her medical insurance was

even cancelled on May 15, 2009, and she does not explain how cancellation of her

medical insurance is an adverse action given the status of her employment in May

2009.  Perhaps the Plaintiff's medical insurance ended when she was placed on unpaid

leave after she failed to return to work.  Yet the Plaintiff has never claimed that being

put on leave was an adverse action.  At that time, the Plaintiff was claiming she was

disabled because of her alleged on the job injury.  Given the circumstances, and absent

any elaboration from the Plaintiff, the Plaintiff has not sufficiently established that

termination of her medical insurance constitutes an adverse action.

Finally, the Plaintiff's alleges that her "firing and subsequent rehiring and finally

terminating [the] Plaintiff's employment" constitute adverse actions. The Plaintiff

provides absolutely no elaboration for these allegations.  Presumably, the Plaintiff first

refers to her brief termination on August 3, 2009, when she failed to return to work after

the expiration of her leave of absence.  That termination was rescinded upon approval

of her short term disability claim the following month.  But she does not explain how this

constitutes an adverse action.  With regard to her "final termination," the Court has no

idea what the Plaintiff is talking about.  Perhaps she refers to her termination when her

long term disability benefits ended in May 2011 (two years after the Plaintiff's EEOC

complaint and one year after the present lawsuit was initiated).  However, neither party

mentions this termination when discussing the Plaintiff's retaliation claim.  Given the

absence of any support, or even any explanation, for her bare allegation that some

unspecified termination constituted an adverse action, the Plaintiff has not sufficiently

established that any "termination" constitutes an adverse employment action.

    In sum, the Plaintiff has failed to establish that she suffered an adverse

employment action.

### c.  The Defendants' Legitimate Nondiscriminatory Reason.

    Perhaps in an effort to match the Plaintiff's failure to support her allegations of

adverse actions, GDIT offers a legitimate nondiscriminatory reason for only one of the

Plaintiff's allegations of adverse action – her August 3, 2009, termination.  The Court

finds this odd because it seems that GDIT had nondiscriminatory reasons for every

action it took.  For example, as discussed, GDIT clearly had reason to controvert the

Plaintiff's workers compensation claim, and it appears undisputed that the delay in the

approval (by Sedgwick) of the Plaintiff's disability claim was due to the Plaintiff's failure

to submit medical records.

    With regard to the August 3, 2009, termination, GDIT alleges, as discussed, that

it terminated the Plaintiff because of her failure to return to work.  At that time, Sedgwick

had denied the Plaintiff's claim for disability benefits because of her failure to submit medical records and the Plaintiff's leave had expired.  GDIT claims it had no choice but to terminate her.  The Plaintiff does not dispute that she did not return to work when given the opportunity.  Nor does she even argue, much less adduce evidence, that this reason for her discharge was pretextual.  Accordingly, even if the August 3 temporary termination was an adverse action, GDIT's legitimate, nondiscriminatory reason for its action stands unrebutted.

Thus, viewing the evidence in the light most favorable to the Plaintiff, she fails to show that her internal and EEOC complaints constituted statutorily protected conduct because her alleged subjective belief that the complained of conduct constituted an unlawful employment practice of GDIT, was not objectively reasonable. Further, the Plaintiff failed to establish that she suffered a materially adverse action as a result of her internal and EEOC complaints.  Thus, the Plaintiff is unable to establish a prima facie case of retaliation, and even if the Plaintiff could, GDIT has articulated a legitimate non-discriminatory reason for the potential "adverse action," that the Plaintiff has failed to rebut.

### 6.  The Plaintiff's Retaliation Claim Pursuant to § 1981 against Ragland

The Plaintiff alleges that the same protected speech (based on the same alleged conduct) and adverse employment actions support her § 1981 retaliation claim against Ragland.  "Contrary to Title VII, 'individual employees can be held liable for discrimination under § 1981.'"  *Moss v. W & A Cleaners*, 111 F. Supp. 2d 1181, 1187 (M.D. Ala. 2000) (quoting *Leige v. Capitol Chevrolet, Inc.*, 895 F.Supp. 289, 293 (M.D. Ala. 1995)).  However, here, the Plaintiff's retaliation claim against Ragland fails for the

same reasons that her retaliation claim against GDIT fails.  Further, there is no evidence

that Ragland participated in GDIT's decision to terminate the Plaintiff after she failed to

return to work.  Accordingly, Ragland is entitled to summary judgment on the Plaintiff's

§ 1981 retaliation claim.

### B.  Identity Theft Claims against Elizabeth Lines, Tabitha Waldrop, and Gwendolyn Krind

The Plaintiff brings identity theft claims against Lines, Waldrop and Krind

pursuant to O.C.G.A. § 16-9-130, which provides:

> Any consumer victim *who suffers injury or damage as a result of a violation of this article* may bring an action individually … against the person or persons engaged in such violations under the rules of civil procedure to seek equitable injunctive relief and to recover general and punitive damages sustained as a consequence thereof in any court having jurisdiction over the defendant ….

O.C.G.A. 16-9-130(a).

The Plaintiff does not point to which particular provision of the Georgia identity

theft statute that Lines, Waldrop, and Krind violated, nor have Lines, Waldrop, and Krind

been criminally prosecuted pursuant to the Georgia criminal statute.  The Plaintiff

merely contends that she "has met her prima facie burden that a reasonable jury could

rule that Defendants Lines, Waldrop, and Krind used the Plaintiff's personal information

to fraudulently establish and use credit accounts under the Plaintiff's name."  (Doc. 169-

1 at 22).  However, it is not clear how the theft occurred.  The most that can be gleaned

from the record is that someone opened store charge accounts in the Plaintiff's name,

using, apparently, her personal information.  It is not clear what information was used or

how it was used.[14]  It is clear that the Plaintiff never had to pay for the charges.  (Doc. 173-3 at 65:9-11).

The Plaintiff alleges the following facts to support her identity theft claims against Defendants Lines, Waldrop, and Krind:  Lines, formerly worked in AT&T's fraud department, and thus would have known how to perpetrate the crime of identity theft.

- Lines, as an administrative assistant at the Warner Robins' office, had access to the Plaintiff's confidential information.

- Lines requested the Plaintiff to provide her with a personal check to set up the direct deposit of her paycheck even though, Plaintiff claims, she was later told that a personal check was not required to set up direct deposit.  The significance of this point is particularly unclear.  Even if a copy of the check was not required to set up the direct deposit, the checking account information was.  Thus, the check adds nothing to the information that would be known to the person collecting the information necessary to set up the direct deposit.  Moreover, the Defendants object to the Plaintiff's reliance on this allegation because she first made the allegation in her response to the Defendants' motion for summary judgment notwithstanding the Defendants' repeated efforts to elicit from the Plaintiff during her depositions the factual bases for her claims.

---

[14] The Plaintiff, citing her own declaration, speculates that the first fraudulent account opened was an AT&T cellular phone account.  (Doc. 169-2 at 37).  According to the Plaintiff, the fake AT&T account was then used to open the other fraudulent accounts.

- The Plaintiff's identity theft "attacks" began shortly after Lines, Waldrop and Kristine Ross expressed their disapproval of the Plaintiff's relationship with Pressey.

- Waldrop had lived or had family in Augusta, Georgia and South Carolina where the identity fraud took place.

- The Plaintiff does not believe that the thefts were carried out by "random strangers."

- Someone told the Plaintiff that the information used in the identity theft appeared to come from an employment application.

- Lines connected her personal laptop to GDIT's network, presumably, the Plaintiff alleges, giving her access to personal information.

- The Plaintiff alleges that a store videotape, which is not in the record, depicts a black female making a purchase with a fraudulent credit card.  The Plaintiff admits that the female in the video does not now currently resemble Krind and that she told Detective Edwards she "could not say that was Gwen Krind" in the videotape.  (Doc. 173-1 at 28:5-6).  But, she claims that older pictures of Krind indicate that, perhaps Krind is the person in the video.  Pressey also claims to have seen a "strong likeness" between Krind and the person in the video. [15]

---

[15] With regard to Krind, the only allegations that support the Plaintiff's claims is the Plaintiff's and Pressey's assertions that Krind resembled a black female using one of the Plaintiff's fraudulently created credit cards at Lowe's.  Detective Edwards determined that it was not Krind in the video.  (Doc. 152-11 at 3) ("Detective Edwards … said she would disqualify me as a suspect based on size alone.").  The Plaintiff explains this away by asserting that Krind looked different in January 2009, at the time Detective Edwards questioned her.  Doc. 169-1 at 17 (claiming that Krind "had become significantly thinner" between the September 2008 surveillance video and January 2009).  No other factual allegations relate to Krind.

(Doc. 169-2 at ¶¶ 14, 20-22, 30-31, 25-36, 42-51, 194-95).[16]

In order to recover pursuant to O.C.G.A. § 16-9-130, the Plaintiff must put forth evidence that (1) Lines, Waldrop and Krind violated Georgia's criminal identity theft statute, and that (2) their violations resulted in the Plaintiff suffering injury or damage.[17] *See* O.C.G.A. § 16-9-130.  Here, viewing the facts in light most favorable to the Plaintiff, the Plaintiff has not put forth probative evidence that Lines, Waldrop and Krind violated Georgia's criminal identity theft statute.

As noted, the detective who investigated the Plaintiff's claim of identity theft found no evidence to support any allegation that the Plaintiff's co-employees were involved in that theft:  "Based on my investigation, I concluded (among other things) that there was no evidence to support Ms. Wells [sic] allegations that her co-workers were involved in the alleged identity theft."  (Doc. 172-1 at 2).  Although the Plaintiff does not object to this testimony, the Court is reluctant to give Detective Edwards's conclusions dispositive weight.  However, the Court fully understands the reasons for her conclusions.  The Plaintiff offers no evidence, other than evidence of motive and opportunity, tending to establish that her co-employees were involved in identity theft.  The Plaintiff cites nothing even suggesting that her co-workers actually committed any

---

[16] Waldrop, Lines, and Krind further object to the Plaintiff's inclusion of new facts and new evidence in her Response.  Specifically, they argue that the Plaintiff attached two new documents—a direct deposit application with a cancelled check attached and a September 28, 2012, Letter from Officer Hawkins of the Montgomery County Police Department—that she did not produce during discovery.  (Doc. 172 at 4 n. 4).  Further, they contend that the Plaintiff's assertion that Lines connected her personal laptop to GDIT's network and that Lines instructed her to give her a personal check to set up direct deposit, were omitted from her deposition testimony.  Because consideration of these factual allegations and two documents do not alter the Court's determination, the Court will not sustain the Defendants' objections.

[17] The Defendants contend that the Plaintiff cannot recover for the identity theft because she never had to actually pay any of the fraudulent credit card balances.  Although it is clear that the Plaintiff did not pay the improper charges, the Court does not grant summary judgment on those grounds.

act of identity theft.  The fact that they did not like the Plaintiff and that they had access to information that <u>may</u> have allowed someone to commit the crime, is not sufficient to create a genuine issue of fact that they did commit the crime.

For example, the fact that Lines allegedly required the Plaintiff to give her a check to initiate a direct deposit account does not link Lines to creating false credit card accounts.  The Plaintiff does not articulate how knowledge of her checking account number translates to knowledge of personal information required to steal someone's identity.   Further, the fact that the Plaintiff does not think the identity fraud was carried out by a random stranger does not create a genuine issue of material fact regarding Lines, Waldrop, and Krind's involvement.   The Plaintiff's further speculation that because she had to fill out a second employment application and because Lines, GDIT's administrative assistant, kept the employment applications in her desk do not, without more evidence, support Lines's involvement in the identity fraud.

Moreover, the Plaintiff fails to dispute the evidence that shows Lines, Waldrop and Krind were not involved in the identity theft.  First, as noted, Detective Edwards investigated all three as suspects and determined there was no evidence the Defendants were involved.  Further, Waldrop provided ATM receipts and cellphone records showing that Waldrop was in Warner Robins when the Plaintiff's identity was allegedly used in other cities.  (Doc. 152-10 at 4, ¶ 13).  Rather than responding by setting forth specific evidence in record to dispute this fact, the Plaintiff just argues that Waldrop failed to prove that she was the one who used her ATM card that weekend. (Doc. 169-2 at 17, ¶ 78).  The Plaintiff "must do more than simply show that there is some metaphysical doubt" to survive summary judgment.  *Matsushita*, 475 U.S. at 586.

Therefore, viewing the evidence in the light most favorable to the Plaintiff, the Plaintiff has not presented sufficient evidence supporting her identity fraud allegations against Lines, Waldrop, and Krind.  Accordingly, summary judgment is appropriate on the Plaintiff's identity fraud claims against Lines, Waldrop, and Krind.

## V.    CONCLUSION

The Defendants' Motion for Summary Judgment is **GRANTED**.  The Plaintiff's Title VII and § 1981 hostile work environment claim and § 1981 retaliation claim against Defendant General Dynamic Information Technology is **DISMISSED**.  The Plaintiff's § 1981 retaliation claim against Defendant Mike Ragland is **DISMISSED**.  The Plaintiff's Georgia identity fraud claims against Defendants Beth Lines, Tabitha Waldrop, and Gwendolyn Krind are **DISMISSED**.

**SO ORDERED**, this 11th day of June, 2013.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT